UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | CRIMINAL NO. 3:14cr163 (JCH) |
| | : | |
| **EL MEHDI SEMLALI FATHI** | : | OCTOBER 6, 2014 |

**SENTENCING MEMORANDUM OF THE UNITED STATES**

**Preliminary Statement**

The United States submits this sentencing memorandum in connection with the October 20, 2014 sentencing of defendant El Mehdi Semlali Fathi ("Fathi" or "defendant"). For the reasons set forth below, the Government requests that the Court impose a non-Guideline prison sentence of up to and including 60 months. A prison sentence of this duration will satisfy the goals of sentencing by promoting respect for the law, deterring the abuse and manipulation of the asylum process which is intended to protect those fleeing from harm -- not to enable those aspiring to engage in harm, -- and sending a clear message that threats to our national security will not be tolerated. Fathi has pleaded guilty to one count of perjury, which he committed in connection with his fraudulent application for refugee status.[1] As set forth below, however, the perjury should not be considered in vacuum. The perjury was only

---

[1] Fathi's extraordinary acceptance of responsibility by pleading guilty to an Information, waiving his right to post-indictment discovery, and accepting a final order of removal have all been considered by the Government in determining the appropriate charge. As required by the terms of his plea agreement, Fathi did submit a letter to the immigration judge in California expressly stating that Fathi perjured his testimony, would not oppose a motion to reopen, and would accept a final order of removal.

1

discovered because of a federal investigation that began because of Fathi's disturbing conduct relating to his aspirational statements about engaging in bomb attacks in Massachusetts and Connecticut.[2] In fact, the perjury charge permitted law enforcement to disrupt and prevent any possibility of a bomb attack.

In order to avoid deportation, Fathi fabricated a detailed story about abuse, persecution and fear. In his refugee application and more extensively in his testimony before an immigration judge, Fathi falsely claimed that he had been repeatedly persecuted by the Moroccan government because of his membership in a pro-independence student union and because of his suspected involvement with a group seeking to overthrow the monarchy. Fathi also claimed that he would continue to suffer persecution if returned to his native Morocco. Fathi's extensive web of lies was not only included in his written submission for refugee status which he submitted under penalty of perjury but his untruthfulness continued when he: (1) confirmed to an immigration judge in Hartford, Connecticut that his application was accurate; (2) repeatedly appeared before an immigration judge in California regarding his refugee application; and (3) testified at length under oath during his merits hearing before an immigration judge in California. This blatant disregard for and repeated abuse of the legal asylum process requires a significant sentence. Our refugee protections are designed to offer protection and hope to those who have been denied fundamental and precious liberties and have been mistreated by their government in their home country.

The evidence in this case makes clear that Fathi, however, was not fleeing from his native Morocco because of abuse or mistreatment. The evidence also supports that Fathi was not very interested in educational pursuits which was the purported reason why he initially sought to

---

[2] Summary transcripts of the recordings are available for the Court's review and were provided to defense counsel to review at the FBI's offices in New Haven, CT.

come to the United States.³  Finally, the information gathered during the course of the federal investigation does not support that Fathi was in any way seeking to integrate into American life.  There is no evidence that Fathi was looking for employment, attempting to create a home, or that he was engaging with a community.  The evidence did reveal that within months of receiving his refugee status in our country and being released from custody, Fathi moved from California to Bridgeport, Connecticut and repeatedly discussed his desire to engage in a bomb attack and went so far as to say, in summary, that there are three things that scare people in the United States: causing harm to schools, the economy, and their sense of security.

Fathi's disturbing and troubling conduct began within months of receiving his refugee status.  For members of law enforcement, the facts of Fathi's case presented one of the most serious and difficult investigations.  That is because law enforcement is aware that "[h]ere at home, we face a continued threat from homegrown violent extremists (HVEs). HVEs are individuals located in the United States who are inspired by terrorist ideology. These individuals present unique challenges because they do not share the profile of an identifiable group. Their experience and motives are often distinct, but they are increasingly savvy and willing to act alone. They may gain inspiration from terrorist narratives, including material in English; events in the United States or abroad perceived as threatening to Muslims; the perceived success of other HVE plots, such as the November 2009 attack at Fort Hood; or their own grievances." *See* FBI Director James Comey's testimony to the House Homeland Security Committee on 9/17/2014:  http://www.fbi.gov/news/testimony/worldwide-threats-to-the-homeland

---

³ FATHI's student visa status was terminated on or about February 20, 2009 by Virginia International University after he failed all of his classes during the Fall 2008 semester and he failed to register for classes for the Spring 2009 semester.

3

The facts developed during the course of an intensive investigation continued to trouble law enforcement such as: 1) Fathi's statements in his refugee application that he was a member or accused of being a member of a subversive group; 2) Fathi's repeatedly stated his desire to travel to Boston during the time he was discussing engaging in a bomb attack at Harvard University; 3) Fathi's comments regarding pliers, cutters and wires at his residence to be used for a bomb; 4) Fathi's statements to others regarding trainings that he received in Afghanistan, his claims about his bomb-making skills and his references to others who were supporting his activities; 5) Fathi's search (using his telephone) on how to make bombs; and 6) Fathi's lack of interest in seeking employment or otherwise showing any signs of engaging in normal community life.

The evidence remains unclear about: 1) whether there is a connection between Fathi fraudulently applying for refugee status and his discussions about his desire to engage in bomb attacks in Cambridge, MA and Hartford, CT.; and 2) whether Fathi would have acted on his stated intentions. Nevertheless, these disturbing and dangerous characteristics of Fathi must be considered in the imposition of any punishment. At best, Fathi's aspirational statements relating to conducting bomb attacks were deeply misguided and caused law enforcement resources to be diverted and focused on him. At worst, he was an individual intent on causing harm in our country. Perhaps the only way to determine Fathi's true intentions would have been to engage in an undercover sting operation (which in other cases has been the subject of some criticism).[4] Because crimes against our nation's security require prevention, once law

---

[4] Kendall Coffey, The Lone Wolf - Solo Terrorism and the Challenge of Preventative Prosecution, 7 FIU L. Rev. 1, 13 (2011) ( "As the fatal and near-fatal cases of lone wolf terrorism demonstrate, solitary schemes provide fewer clues prior to perpetration. To confront the daunting challenges of prior detection and the frightful consequences of failure, federal authorities pursue even modest evidence of terrorist leanings with intensity in

enforcement was able to determine that Fathi had fabricated his asylum application, that criminal conduct was charged to disrupt any potential harm. *See* Dru Stevenson, Entrapment and Terrorism, 49 B.C. L. Rev. 125, 215 (2008) ("Unlike "victimless" crimes, terrorism requires an emphasis on prevention more than punishment.").

**Factual Background**

The Government incorporates the affidavit in support of the arrest warrant by reference herein and offers the following brief summary of the facts in this case. Fathi entered the United States on a student visa in January 2008. Only one year after entering the United States, Fathi's student visa status was terminated on or about February 20, 2009 by Virginia International University after he failed all of his classes during the Fall 2008 semester and he failed to register for classes for the Spring 2009 semester. Fathi's activities from the time his visa was revoked until December 2010 when he was arrested for trespassing in Virginia were not known.

After Fathi's trespassing arrest in Virginia, he was placed on an immigration detainer. After he was found removable, he submitted an I-589 refugee application and claimed that all of the information on the form was accurate. In that form, he claimed that he had been persecuted by the Kingdom of Morocco and would be arrested, detained, and tortured if he returned to Morocco. While his application was pending, Fathi traveled to California where he was arrested for theft, at which point another immigration detainer

---

order to assure that no stone is left unturned. To unearth any symptom of Islamic militancy, undercover agents make aggressive attempts to test a subject's attitudes and potential for destructive conduct. At times, these pursuits include immersing the subject in unrelenting enticements that, as one observer suggested, 'might be having the effect of turning armchair observers to active radicals.' As with any sting operation, imaginary schemes are created by investigators to bait the trap for the subject. As a result, questions may arise as to whether a crime was prevented by law enforcement or effectively created by undercover informants.").

was lodged against him. After Fathi was released from immigration custody in Virginia, he traveled to Bridgeport where he resided for a period of time. Fathi then traveled to California. Fathi's activities in California until the time of his arrest in California were not known.

At the merits hearing on his asylum application in August 2008, he testified extensively under oath about his numerous arrests by Moroccan authorities for participating in demonstrations and the beatings and persecution that he allegedly encountered. Fathi was granted withholding of removal on August 16, 2013, and he was released from immigration custody.

After his arrest, Fathi admitted that he had met a Nigerian national while incarcerated who helped Fathi with his application for asylum in exchange for $100. Fathi also admitted that he fabricated the information in that application.

The federal investigation in this case began in January 2014, -- only approximately four months after Fathi received his refugee status, -- when the FBI received information that Fathi was residing in Bridgeport, Connecticut and making statements about engaging in bomb attacks in Massachusetts. Given that Fathi had only been in the United States since January 2008 and not much was known about his activities during significant portions of that time, law enforcement worked diligently to determine whether his stated intentions to engage in a bomb attack were realistic.

Law enforcement immediately began investigating his background which included his refugee application. FBI agents learned from the Enforcement and Removal Office (ERO) in Hartford, Connecticut, that Fathi's immigration file had been transferred to Connecticut because he was residing in Connecticut and that ERO was monitoring Fathi

while he was released on an Order of Supervision.  FBI began working with ERO authorities to prevent Fathi from traveling to Boston.  Unfortunately, once Fathi realized that he could not travel to Boston, he began making statements about his desire to conduct a bomb attack at the federal building in Hartford, Connecticut.  Pursuant to protocol, law enforcement alerted the various institutions and cities that were potential targets and **constant surveillance was required.**

Based on information obtained from surveillance and during the course of the investigation, it became more apparent that Fathi was not engaged in seeking employment nor was he engaged in any normal activities expected from an individual seeking to emerge themselves into American life.  Instead, Fathi continued to make disturbing comments relating to traveling to Afghanistan, his knowledge of making bombs, his connections to a group that was allegedly working with him to accomplish his stated intentions, and various training he had received in weapons and intelligence gathering.  In an effort to gather as many facts as possible to determine whether Fathi was capable of engaging in a bomb attack and whether he was willing to act on his stated intention, among many other things, federal agents asked the Arabic translator about Fathi's tone and for other non-verbal or cultural cues.  The translator indicated that Fathi appeared:  1) serious; 2) to have knowledge about bomb-making; 3) to speak in a low voice; and 4) to the translator, to be dangerous.

Because of the growing concern, FBI and DHS agents began actively working with their counterparts in Casablanca, Morocco to investigate Fathi's life in Morocco. Fortunately, the Kingdom of Morocco is a country where federal agents had the ability to conduct an investigation. DHS agents were able to interview Fathi's family members

including his parents who cooperated fully with law enforcement. The parents provided detailed information of Fathi's life in Morocco and confirmed that Fathi had never been arrested nor had he at any time attended any university or lived in Marrakech. The parents confirmed that Fathi had resided with them and was fully supported by them. The parents provided critical documentation that corroborated various schools or training programs that Fathi was enrolled in. Law enforcement reported that Fathi's parents were shocked and deeply impacted when they learned about Fathi's conduct in the United States but expressed their own concerns because of, among other things, Fathi's increasing lack of communication with them since in or about 2011.[5] Moreover, other information obtained by law enforcement in Morocco also corroborated that material statements contained in Fathi's refugee application were clearly false. Accordingly, within weeks *before* the first anniversary of the Boston marathon tragedy, law enforcement arrested Fathi and he has been detained since his arrest.

## II.     Legal Standard

The Supreme Court clarified the continuing role of the Sentencing Guidelines and the scope of the sentencing court's discretion in *United States v. Booker*, 543 U.S. 220 (2005). *Booker* makes clear that this Court must consider both the sentencing factors set forth in 18 U.S.C. Section 3553(a) and the Sentencing Guidelines in fashioning a reasonable sentence. *Id.* at 764. While the Sentencing Guidelines are no longer mandatory following *Booker*, they must still be considered in determining the appropriate sentence. The Second Circuit has recognized the continuing relevance of the Sentencing Guidelines following *Booker* in determining an appropriate sentence:

---

[5]  The report of the interview with Fathi's parents was disclosed to defense counsel and is available to the Court for review if requested.

> [I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.  Thus, it would be a mistake to think that, after *Booker/Fanfan*, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum.  On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a).  We have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice.

*United States v. Crosby*, 397 F.3d 103, 113-14 (2d Cir. 2005).

Under the non-mandatory Guideline regime established by *Booker* and *Crosby*, the sentencing judge is empowered to make the factual findings necessary for determining what the recommended Guideline Sentence is in a particular case.  *Crosby*, 397 F.3d at 113 ("the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence").

### III.     The Sentencing Guidelines Calculation

The PSR properly calculated the Sentencing Guidelines as follows:

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

```
U.S.S.G. § 2J1.3(a) - base level offense . . . . . . . . . . . . . . . . . . . . . . . . .  14
U.S.S.G. § 2J1.3(b)(2). . .  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  +3
U.S.S.G. § 3E1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -3
```

An offense level of 14 and a criminal history category II results in a Guidelines sentence range of 18-24 months of incarceration.  As one of the factors under 3553(a), the Court will consider this Guidelines range in fashioning an appropriate sentence. As set forth in this memorandum, the applicable Guidelines simply do not take into account Fathi's troubling and disturbing conduct which initiated the federal investigation.

## IV. The Section 3553(a) Factors

### A. The Serious Nature of the Offense.

Fathi has pleaded guilty to perjury in connection with his application for refugee status. While perjury alone is a serious offense, this criminal conduct is even further magnified by the fact that Fathi repeatedly and intentionally lied over a lengthy period of time in order to manipulate the asylum system. *See Sarhan v. Holder*, 658 F.3d 649, 662 (7th Cir. 2011) (discussing the importance of the laws regarding asylum and withholding of removal); *Maharaj v. Gonzales*, 450 F.3d 961, 984 (9th Cir. 2006) ("Our refugee system is intended for those in flight, and in need of a safe harbor."). More importantly, in this case almost immediately after receiving refugee status and being released from custody, Fathi began his disturbing and troubling conduct which began with making statements about engaging in bomb attacks. While Fathi now insists that all of his statements were nothing more than a joke, his saying so doesn't make it so. Given all of the facts here, Fathi's conduct relating to the bomb threats is aggravating and dangerous conduct that deserves to be punished. *United States v. Stewart*, 686 F.3d 156, 170 (2d Cir. 2012) cert. denied, 134 S. Ct. 54, 187 L. Ed. 2d 257 (U.S. 2013) ("While '[t]he First Amendment forbids the uncabined reliance on a defendant's 'abstract beliefs' at sentencing ... the government may introduce evidence of beliefs or associational activities, so long as they are relevant to prove [permissible sentencing factors, such as] motive or aggravating circumstances, to illustrate future dangerousness, or to rebut mitigating evidence.'"); *see also Pepper v. United States*, 131 S. Ct. 1229, 1241, 179 L. Ed. 2d 196 (2011) ("Congress could not have been clearer in directing that "[n]o limitation ... be placed on the information concerning the background, character, and conduct" of a defendant that a district court may "receive and consider for the purpose of imposing an appropriate sentence."). It is

beyond dispute that a sentencing court may consider a defendant's conduct even where that conduct resulted in an acquittal, the dismissal of charges, or where the conduct was never charged at all. *See, e.g., United States v. Vaughn*, 430 F.3d 518 (2d Cir. 2005) (holding post-*Booker* that a district court may take into account acquitted conduct when sentencing a defendant); *United States v. Bosgang*, 467 F. App'x 27, 29 (2d Cir. 2012) (sentencing judges may take into consideration activity charged in dismissed counts); *United States v. Wernick,* 691 F.3d 108, 117–18 (2d Cir.2012) (sentencing court may consider uncharged conduct of defendant even though conduct is not "relevant conduct" under the Guidelines). Here, Fathi's conduct is deeply disturbing and deserves to be punished.

  B. <u>History and Characteristics of the Defendant</u>.

  Unlike so many defendants who come before this Court, based on the interviews conducted in Morocco and by his own admissions in the PSR, defendant Fathi has had a stable and supportive upbringing. In fact, his parents provided him with the extraordinary opportunity to pursue a higher-level of education in this country and financially supported him. Thus, his upbringing and opportunity cannot be the cause of his criminal conduct. Indeed, there appears to be nothing in his background that can explain, excuse or justify his criminal conduct. His actions in the United States demonstrate an individual who failed his classes, violated the terms of his student via and repeatedly ignored, violated, and manipulated our immigration laws. It is clear based on the interview with Fathi's parents that he could have easily returned to Morocco at any time where he would have received support of his family. Instead, Fathi chose to engage in unlawful efforts to remain here, even during periods of immigration detention, increasingly cut himself off from his family in Morocco and created detailed fantasies of his life in Morocco which involved subversive and violent acts. After

being granted refugee status, he lived a life of a loner who repeatedly began discussing his desire to cause harm in our country.  All of these facts demonstrate that Fathi deserves to be punished for taking advantage of our refugee laws.  In short, he should be punished for becoming a danger to our society.

            C.      <u>The Court Should Consider Deterrence, Both General and Specific and Impose a Sentence that will Promote Respect for the Law</u>.

One of the factors the Court must consider in imposing sentence is the need for the sentence to "afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(B).  The Court will also consider the type of sentence that will promote respect for the law.  These two goals of sentencing can be achieved with a prison sentence of up to five years.  Neither of these goals can be achieved by imposing the type of sentence that would be viewed as the proverbial slap on the wrist.

A significant prison sentence of up to five years for Fathi - - who has caused so much concern for law enforcement and the institutions that he sought to harm in our country - - can serve as a powerful deterrent against the commission of these types of threats.  It is imperative that men and women who come to our country do not perpetrate fraud on our refugee process.  Our refugee laws exist to protect those fearing genuine harm and are a testament to our nation's values.  When individuals, like Fathi, perpetrate fraud, manipulate the refugee process and then aspire to harm our country, it undermines the very systems that exist to support and defend our values.  The Court's sentence must send a message to Fathi, and to others like him, that will deter Fathi and others from seeking to manipulate our legal process and cause harm to our country.  Individual deterrence is especially relevant because Fathi needs to be deterred from ever again permitting his immaturity and his stated desire to cause harm to our country to guide his actions.  Such conduct should not be tolerated.  Thus,

12

the sentence imposed by the Court should specifically deter Fathi from acting on his stated aspirations.

## Conclusion

Given the facts of this case, and the seriousness danger posed by Fathi's criminal conduct, a sentence is above the applicable guidelines range is clearly appropriate here.

Respectfully submitted,
DEIRDRE M. DALY
UNITED STATES ATTORNEY

/S/
KRISHNA R. PATEL
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO.: ct24433
UNITED STATES ATTORNEY'S OFFICE
1000 LAFAYETTE BOULEVARD, 10th FLOOR
BRIDGEPORT, CT 06604
(203) 696-3000

## CERTIFICATION

I hereby certify that on October 6, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing, as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/S/ _____
KRISHNA R. PATEL
ASSISTANT UNITED STATES ATTORNEY

Respectfully submitted,

        DEIRDRE M. DALY
        UNITED STATES ATTORNEY

        /S/
        KRISHNA R. PATEL
        ASSISTANT UNITED STATES ATTORNEY
        FEDERAL BAR #ct24433
        UNITED STATES ATTORNEY'S OFFICE
        1000 LAFAYETTE BOULEVARD
        BRIDGEPORT, CT 06604
        (203) 696-3000 (phone)
        (203) 579-5550 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that on _____, 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF.

    /s/_____

Krishna R. Patel

Assistant U.S. Attorney